TOBIAS ECKENRODE *vs.* THE CHEMICAL COMPANY OF
CANTON OF BALTIMORE COUNTY.

*Damages for Failure and Refusal to comply with a Contract—
Questions of Evidence—Contract made by an Agent of a Cor-
poration not appointed as prescribed by the Act of 1868,
ch. 471.*

On the 15th May, 1879, at Taneytown, Md., the appellee and the
appellant entered into the following contract:

" We have this day contracted with Mr. T. H. Eckenrode, of this
place, for the manufacture of two hundred tons of phosphate, by
his formula, and to be branded with his brand. The goods to be
manufactured between July 15th and July 30th, 1879. T. H. Eck-
enrode is to superintend the making of it. The goods are sold to
him on the following terms, viz: He is to give his notes, one paya-
ble the 1st October, 1879, with interest; the other payable the 1st
January, 1880, and to bear interest from the 1st October, 1879.
The goods are to cost twenty-five dollars per ton. He has the
privilege of increasing above order one hundred tons more, if done
before the 20th July:" which was signed by the appellee, per "W.
C. Matheson, Agt."

" I accept the goods on above terms and conditions:" signed by
the appellant.

On the 1st July, 1879, the appellant was at the place of business
of the appellee in Baltimore, and went with the appellee's secretary
to their manufactory, where a dispute arose as to how the phos-
phate should be made, he insisting that what is termed the dry
process should be followed, and they that the wet process was as
good, and it was finally proposed and agreed that a ton should be
made by the latter process, so that the appellant could examine it
as a sample; on the afternoon of the same day the appellant went
to the appellee's office, where their president was also present, and
the sample was shown him, and he said he would not have an
article of that kind, and would not accept such an article if it was
made by the appellee, and that he countermanded his order for
making said phosphate by the appellee; the president replied that
he would not agree to this, and would hold the appellant to said

Eckenrode *vs.* The Chemical Co. of Canton.

contract, and that if the appellant would not agree to the appellee's making the phosphate appellee's way, the appellee would make it appellant's way, or any way he wanted it. The appellant replied he had countermanded his order and would have no more to do with it. On the 25th July, the appellee's secretary wrote the appellant that he still had five days time in which to complete his contract with the appellee, and that the appellee was prepared to fill their part of the contract as called for, and notified him that they had the goods as called for on hand, and had had them since the 1st July, 1879. To this the appellant replied, by repeating substantially what he had before said. In an action brought by the appellee on the 9th August, 1879, to recover damages from the appellant, in consequence of his failure and refusal to comply with the contract, it was HELD:

That the appellee could maintain the action, and that the measure of damages was the difference between the cost of manufacturing the article according to the contract, and the price the appellant agreed by that contract to give for it.

Evidence offered by the appellee as to what the appellant said to the appellee's secretary on the 1st July was admissible, as tending to show that the appellant was then unwilling to comply with his contract, and to explain his reason therefor, and his subsequent countermanding of the order and repudiation of the contract; and it was competent for the appellee to prove that after the 1st July, the appellant never went to appellee's office or manufactory to superintend the making of the phosphate.

Evidence offered by the appellant to show what was the understanding between the appellee's agent and the appellant at the time the contract was made, in reference to the appellant's superintending the manufacture of the phosphate, and for what purpose and with what intent the clause as to such superintendence was inserted in the contract, was inadmissible.

The letter written on the 25th July, by the appellee's secretary to the appellant, produced by the appellant upon notice, was admissible in evidence.

The appellant offered to prove by L. that in September, 1879, he applied to the appellee to buy a quantity of S. C. bone, and was told by the appellee that they had none on hand. On objection, it was HELD:

That the evidence offered was irrelevant and inadmissible.

Eckenrode *vs.* The Chemical Co. of Canton.

The appellant, on cross-examination of a witness for the appellee, asked him: what was the lowest price at which plaintiff sold any ton of phosphate manufactured by plaintiff during July, 1879? On objection, it was HELD:

That the question should not be asked or answered.

Where an offer is made generally of a mass of testimony complex in its character, and the whole of it is objected to, it is error to exclude the whole if any part of it is admissible; but in such case it must appear that some part of the testimony offered is clearly admissible.

A valid contract binding upon a corporation may be made by an agent not appointed as prescribed by the Act of 1868, ch. 471, as not only the appointment but the authority of the agent may be implied from the adoption or recognition of his acts by the corporation or its directors.

APPEAL from the Circuit Court for Carroll County.

The case is stated in the opinion of the Court.

*Exceptions.*—At the trial it was admitted that the defendant was a corporation incorporated under the Act of 1868, ch. 471, the General Incorporation Law of the State of Maryland.

*First Exception.*—The plaintiff then offered to prove that the paper set forth as the contract in the opinion of the Court, was in the hand-writing of W. C. Matheson, and that the signature thereto was in his hand-writing, and that the signature of defendant was in defendant's hand-writing, and that said Matheson was an agent of plaintiff and was appointed by the secretary of plaintiff, with the approval of the president of plaintiff, and that said appointment was made verbally and approved by said president verbally. The defendant objected to the competency and admissibility of said proof offered. The Court, (HAYDEN, J.) overruled the objection and permitted the proof offered to be given to the jury. The defendant excepted.

*Second Exception.*—The plaintiff then gave in evidence the facts in offer of proof in first exception, and offered to read in evidence the said paper as and for a contract between plaintiff and defendant. The defendant objected. The Court overruled the objection, and permitted the same to be given in evidence, as and for a contract as aforesaid. The defendant excepted.

*Third Exception.*—The plaintiff then proved by the defendant as a witness, that at the time of the execution of said paper, the defendant gave to said Matheson the formula referred to in said paper and which was endorsed on the same. The plaintiff further proved by the defendant that on the 1st July, 1879, he, the defendant, went to the plaintiff's office on Charles street, in Baltimore City, and spoke of the paper given in evidence as a contract, which was exhibited to him, and he referred to the formula thereon, and said it was all right; and then offered to prove that on said occasion the defendant said to the secretary of plaintiff that there was not much money in said contract for the plaintiff, and that the plaintiff had better let him, the defendant, throw up the contract and let him get all his goods from one man, for the purpose of proving that the defendant was unwilling to comply with the said contract, and his refusal to comply with the same, and the causes and reasons of said unwillingness and refusal. The defendant objected to the admissibility of said proof offered, and the Court overruled the objection; whereupon the defendant excepted.

*Fourth Exception.*—The defendant having answered the question as proposed in the last foregoing offer, in the negative, the plaintiff further proved by the defendant, the facts set forth in the opinion of the Court, as to what occurred on the 1st July, 1879.

*Fifth Exception.*—The defendant's attorney on cross-examination of defendant as a witness offered to prove the facts set forth in the Court's statement of this exception.

The purpose of the offer of this evidence was to show that it was understood by and between said purporting agent and defendant, at the time said contract was entered into, that defendant was to superintend the manufacture of the phosphate in the contract mentioned, for the express purpose of the defendant's seeing and knowing that said phosphate was manufactured in the same manner in which defendant manufactured the same at Taneytown; and that the purpose stated was the sole and only reason for the insertion in the contract of the provision relating to superintendence by defendant, and that the words relating thereto, contained in said contract, were used therein for the purpose and with intent, of both said purporting agent and defendant, of embodying and expressing said purpose; and that when said contract was made, it was understood by and between said person who signed the same as agent and defendant, that the words therein, touching superintendence of defendant, were so inserted and used with intent to secure to defendant assurance that said phosphate would be made in same manner as defendant had manufactured phosphate at Taneytown.

*Sixth Exception.*—The evidence admitted by the Court below under this exception is stated in this Court's opinion in connection with that contained in the third exception, the plaintiff having offered to prove by Mr. Bernard Baker, secretary of the plaintiff, what defendant said in witness' presence on the 1st July, 1879.

*Seventh Exception.*—The letter admitted in evidence under this exception and the answer to it, are set forth in the opinion.

*Eighth Exception.*—The question objected to by the plaintiff in this exception, is stated in the opinion.

*Ninth Exception.*—This is sufficiently stated in the opinion.

*Tenth Exception.*—The defendant then offered to prove by —— Linton, that in September, 1879, he applied to the

plaintiff to buy a quantity of South Carolina bone, and was told by plaintiff, that plaintiff had none on hand; but the plaintiff objected to the admissibility of said proof, and the Court sustained the objection and refused to permit said proof to be given; whereupon the defendant excepted.

*Eleventh Exception.*—After foregoing bills of exception had been taken, signed and sealed, the defendant offered further evidence, and the testimony was closed on both sides. Thereupon the plaintiff offered two prayers, and the defendant offered thirteen prayers, the substance of these prayers appears in the Court's opinion.

The Court granted the plaintiff's prayers and rejected those of the defendant. The defendant excepted. And the verdict and judgment for $1000 damages, and $14.53 costs, being for the plaintiff, the defendant appealed.

The cause was argued before BARTOL, C. J., BOWIE, MILLER, ALVEY and IRVING, J.

*William P. Maulsby,* for the appellant.

*Charles B. Roberts,* for the appellee.

MILLER, J., delivered the opinion of the Court.

In this case an action was brought by the appellee, a corporation incorporated under the General Incorporation Law of the State, to recover damages from the appellant in consequence of his failure and refusal to comply with the terms of the following contract:

"Taneytown, Md., May 15th, 1879.

"We have this day contracted with Mr. T. H. Eckenrode of this place for the manufacture of two hundred tons of phosphate by his formula and to be branded with his brand. The goods to be manufactured between July 15th

and July 30th, 1879. T. H. Eckenrode is to superintend the making of it. These goods are sold to him on the following terms, viz: He is to give his notes, one payable the first day of October, 1879, with interest; the other payable first day of January, 1880, and to bear interest from the first day of October, 1879. The goods are to cost twenty-five dollars per ton. He has the privilege of increasing above order one hundred tons more if done before the 30th of July.

"Chemical Co. of Canton,

"Per W. C. Matheson, Agt.

"I accept the goods on above terms and conditions.

"T. H. Eckenrode."

This contract though evidently the work of an unskilful hand, is yet so plain as not to leave its construction in any manner of doubt. It imposes upon the company the obligation and duty to manufacture the specified tons of phosphate between the named days, according to Eckenrode's formula, and under his superintendence, to brand them with his brand, and to deliver, or tender delivery of them to him when so manufactured. Upon Eckenrode it imposes the obligation and duty to furnish his formula, to attend or proffer himself ready to attend and supervise the work of manufacture between the days specified, to receive the two hundred tons when so made, and to pay for them the price of twenty-five dollars per ton, by giving his notes therefor payable at the specified dates, with interest from the times stated.

The suit was brought on the 9th of August, 1879, and the declaration after setting out the contract, avers that the plaintiff was ready and willing and prepared in all respects to manufacture the two hundred tons of phosphate according to the agreement, and also the additional one hundred tons, at and between the time and times, and according to the terms and conditions of the agreement,

and had furnished and provided for the manufacture thereof the requisite materials and appliances according to the formula furnished by the defendant, and in pursuance of the terms of the agreement. It then assigns and avers as a breach "that on or about the *fifth day of July*, in the year 1879, the defendant countermanded the order for said phosphate, and notified the said plaintiff that he would not accept and purchase said phosphate if made by the said plaintiff, and refused utterly to fulfil and perform his undertakings, agreements and contracts as aforesaid under said agreement." The question first and mainly argued in the case is, whether this countermanding of the order by the defendant and his refusal to accept and purchase the phosphate if manufactured, made and announced to the plaintiff *before* the time of performance as stipulated by the contract had arrived, constitutes a good ground of action; and as to this we entertain no doubt.

In the case of *Coit vs. Ambergate, &c., Railway Co.*, 17 *Adol. & Ellis, N. S.*, 117, it was decided by the Court of Queen's Bench that where there is an executory contract for the manufacturing and supply of goods from time to time, to be paid for after delivery, if the purchaser having paid for and accepted a portion of the goods contracted for, gives *notice* to the vendor not to manufacture any more, as he has no occasion for them, and *will not accept* or pay for them, the vendor having been desirous and able to complete the contract, he may, *without manufacturing and tendering the rest of the goods*, maintain an action against the purchaser for a breach of the contract; and that he is entitled to a verdict on pleas traversing allegations that he was ready and willing to perform the contract, that the defendant refused to accept the residue of the goods, and that he prevented and discharged the plaintiff from manufacturing and delivering them. Such *notice* by the defendant the Court held was a legal prevention, though there was no other act of obstruction.

That case and the doctrine it announces were approved by this Court in *Black vs. Woodrow & Richardson*, 39 *Md.*, 194. Since then later decisions have carried the doctrine still further, and we think it may now be regarded as settled law, both in England and in this country, that where there is a contract like the present for the manufacture and delivery of goods at a definite future period, and before the time of performance arrives the purchaser repudiates the contract and declares he will not be bound by it, or accept the goods if manufactured, and notifies the vendor to that effect, such refusal and notice is a breach of the contract which excuses the vendor from manufacturing the goods, and furnishes him a good cause of action provided he shows himself to have been ready, willing, and able to perform on his part; and for such breach he may sue, if not at once, certainly, as the plaintiff did here, as soon as the period of performance fixed by the contract has elapsed.

The question next presented is: Was there any evidence in the cause legally sufficient to authorize the jury to find such refusal and notice by the defendant? In our opinion there is in the record an abundance of such evidence. The defendant himself testifies to the effect that on the 1st of July, 1879, he was in Baltimore, and went with the company's secretary to their manufactory, where a dispute arose as to how the phosphate should be made, he insisting that what is termed the dry process should be followed, and they that the wet process was as good, and it was finally proposed and agreed that a ton should be made by the latter process so that he could examine it as a sample; that on the afternoon of the same day he went to the company's office, where Mr. Baker their president was also present, and the sample was shown to him, and he said he would not have an article of that kind, and would not accept such an article if it was made by the plaintiff, "and that *he countermanded his order for making said*

*phosphate by plaintiff;* the president replied that it took two to make a contract and two to rescind it, that he would not agree to defendant's said countermanding his order to make said phosphate, and would hold him to said contract, and that if defendant would not agree to plaintiff's making said phosphate plaintiff's way, *plaintiff would make it defendant's way or any way he wanted it;* that defendant replied *he had countermanded his order and would have no more to do with it."* Substantially the same account of what took place at this interview is given by the president and secretary, the latter testifying, that the defendant, after the president had said to him that the phosphate *should be made any way he wanted it,* replied, *"I won't have anything to do with it."* It also further appears that on the 25th of July, the secretary wrote a letter to the defendant, in which he says, " you still have five days time in which to complete your contract with us. We are prepared to fill our part of the contract as called for. What do you propose to do about it? We now notify you that we have the goods as called for on hand, and have had them since July 1st, 1879. Please let us know what action you propose to take and we will proceed at once on our course of action." To this the defendant replied by a letter on the 28th of July, in which he says, " I answered your question when I was there to manufacture the phosphate ; I told you that the kind of phosphate you proposed to make for me I rejected, would not have it, and *that I countermanded the whole order; I still say the same."* From this and other testimony in the record which need not be stated, it was clearly competent for the jury to find all the hypotheses of fact in the plaintiff's first prayer, and these facts amounted, as we have said, to a breach of the contract by the defendant, and gave the plaintiff the right to maintain this action.

The plaintiff's first prayer also states the measure of damages to be " the difference between the actual cost to

the plaintiff per ton of said phosphate manufactured according to the formula of the defendant, and by the dry process spoken of by the witnesses, and branded with the defendant's brand, and the price per ton of said phosphate specified in said contract." This rule of damages when applied to a contract like the present, seems to be not only right in principle but amply sustained by authority. It is substantially the same as that adopted in the analogous case of *Masterson vs. Mayor, &c., of Brooklyn,* 7 *Hill,* 61, a case that was approved by this Court in *Dugan vs. Henderson,* 36 *Md.,* 567. There is proof in the record from which the jury could rightfully have found that damages, measured by this standard, had been sustained by the plaintiff, and there is none that the contract had ever been mutually or validly rescinded.

What we have thus said covers and sustains the rulings of the Court below, in granting the plaintiff's two prayers, and in rejecting all those of the defendant except the thirteenth which will be noticed hereafter. This brings us to the exceptions taken by the defendant to the rulings upon questions of evidence. These are ten in number, but as to many of them very little was said in argument. They are, however, in the record, and it is our duty to dispose of them. In doing so, we shall say but very little as to those, in which we regard the rulings as clearly correct. The evidence offered by the plaintiff and admitted by the Court in the *third* and *sixth* exceptions, as to what the defendant said to the plaintiff's secretary on the morning of the 1st July, when he first went to the company's office, seems to us to be clearly admissible, as tending to show that the defendant was then unwilling to comply with his engagements to the plaintiff, and to explain the reason of that unwillingness, and his subsequent countermanding of the order and repudiation of the contract. It was also clearly competent for the plaintiff to prove, as the Court allowed to be done in the *fourth*

exception, that after the 1st of July, the defendant never went to Baltimore or to the plaintiff's office or manufactory, to superintend the making of the phosphate. In the *fifth* exception, evidence was offered by the defendant and rejected by the Court to show what was the understanding between Matheson, the plaintiff's agent, and the defendant at the time the contract was made, in reference to defendant's superintending the manufacture of the phosphate, and for what purpose and with what intent the clause referring to such superintendence was inserted in the contract. There was no error in rejecting this testimony. The contract must speak for itself, and besides, if the purpose was in fact such as the offer states, it would have no bearing upon or relevancy to the issues in this action, or to any question it was the province of the jury to determine. Equally clear is the ruling in the *seventh* exception admitting in evidence the letter of the 25th of July, already referred to, written by the plaintiff's secretary to the defendant. It was produced by the defendant upon notice, and we can see no possible objection to its admissibility. The same thing may be said of the ruling in the *tenth* exception. The testimony offered by the defendant in that exception, and rejected by the Court was wholly irrelevant and clearly inadmissible.

In the *eighth* exception the defendant's counsel, on cross-examination of a witness for the plaintiff, asked him, "what was the lowest price at which plaintiff sold any ton of phosphate manufactured by plaintiff during the month of July, 1879;" and the Court, upon objection made, refused to permit this question to be asked or answered. We cannot perceive the relevancy to the issue in this case of any answer the witness could have made to this question. The company were entitled to the benefit of their contract with the defendant whether more or less could be made out of it, provided they were ready and willing to perform it, and it was wholly immaterial

whether they filled other contracts and made other sales during the same time at a greater or less profit. The evidence shows they were largely engaged in the manufacture and sale of fertilizers, were doing an extensive business, were seeking and filling all orders they could obtain, were constantly buying in large quantities the materials described in the defendant's formula, and that they were at all times able, ready, and willing to manufacture the number of tons specified in this contract and according to its terms. As to these facts there is no conflict of testimony. If then they could comply with this contract, and at the same time fill other orders and make other sales, what matters it to the defendant whether they sold every ton they made for more or less than he agreed to give them, or at what price such sales were made? It was his obligation to abide by his contract, and he is now sued for his refusal to do so. The measure of damages is the difference between the cost of manufacturing the article according to the contract, and the price he agreed by that contract to give for it, and surely it can furnish no excuse to him, no defence to the action, and no mitigation of the damages, that the company sold to other parties every ton they made in this month for more or less than his contract price. We are therefore of opinion there was no error in this ruling.

In the *ninth* exception the defendant offered to prove a number of facts by the witness Rittler, and there was a general objection to the whole offer which the Court sustained. Undoubtedly the rule of practice in this State is well settled, that where an offer is made generally of a mass of testimony complex in its character, and the whole of it is objected to, it is error to exclude the whole, if any part of it is admissible. *Carroll's Lessee vs. Granite Manufacturing Company*, 11 *Md.*, 399; *Curtis vs. Moore*, 20 *Md.*, 93. But to justify the application of this rule it must appear that some part of the rejected testimony was

clearly admissible. There can be no doubt as to the irrelevancy of almost every item of the present offer. For instance, the facts that it is important to dealers in phosphates to maintain the good character of their brand, that a phosphate manufactured by the dry process is better, and costs more to manufacture it, than one made by the wet process, that it is important the bones should be thoroughly dissolved, that sulphuric acid is the dissolving agent, that some bones absorb more acid in the process of dissolving than others, and that some are liable to be imperfectly dissolved when mingled with others, are all matters entirely foreign to any issue, or any question legitimately arising in this case. To that clause of the offer, however, which refers to the *greater cost* of manufacturing by the dry, than by the wet process, are added the words "*and the amount of difference of said cost,*" and it is argued that it was competent for the defendant to prove the amount of this difference of cost, and that such evidence has a direct bearing on the question of damages. But the measure of damages as laid down in the plaintiff's first prayer, which we have said is correct, is the difference between the cost of manufacturing by the *dry process* and the *contract price*. It was therefore irrelevant to prove the difference in cost *between the two processes* of manufacture, or the amount of that difference, because that would furnish no *data* to the jury in ascertaining the damages, under the rule by which they were to be guided in this matter. Nor was there any proof of the amount of this difference offered by the plaintiff to which such proof could be a reply even if that would make it admissible. We think therefore that this part of the offered testimony was inadmissible, and that the ruling in this exception is correct.

The *first* and *second* exceptions present the same question. The plaintiff offered in evidence the contract sued on, having first proved the signatures of the defendant

Eckenrode *vs.* The Chemical Co. of Canton.

and of Matheson thereto, and that Matheson was verbally appointed agent by the secretary, and that his appointment was verbally approved by the president of the company. The Court then admitted the contract in evidence and to this ruling the defendant excepted. Among the powers granted to corporations by the General Corporation Law of 1868, ch. 471, under which this company was incorporated, is that of appointing a president from among the directors and such officers and agents as the business of the corporation shall require, and it has been argued that an agent authorized to make a contract like this must be appointed either by the body of the corporators or by resolution or vote of the directors. As a general rule this is true, but it does not follow that a valid contract binding upon the corporation may not be made by an agent not so appointed. The doctrine is now well settled, "that not only the *appointment* but the authority of the agent of a corporation may be implied from the adoption or recognition of his acts by the corporation or its directors." *Angell & Ames on Corp.*, sec. 284. In the further progress of the case, after these exceptions had been taken, it was shown by abundant proof, not only that the act of Matheson in making this contract and the contract itself were so recognized and adopted by the company, but the defendant himself acknowledged and recognized it as a contract with the company, treated the company as the contracting party, and acted under the contract by furnishing the formula to which it refers. Had these facts been first proved, or had the offer of the contract been accompanied with an offer to prove them, the rulings in these exceptions would have been entirely correct. From what was thus afterwards proved it is obvious that it was an error to make them upon the state of case then existing, it was an error from which the defendant suffered no injury; and such an error affords no ground for reversal. This disposes

not only of these exceptions, but of the defendant's thirteenth prayer, which asserts that there was no sufficient evidence that Matheson was the duly constituted agent of the company at the date of the contract and therefore the plaintiff cannot recover. It is to be noted also that the plaintiff's first prayer leaves it to the jury to find that Matheson *was the agent* of the plaintiff, and it may be that the question of agency *vel non* was one of law and not of fact, but as no exception appears by the record to have been taken to the prayer on this ground, in the Court below, this Court cannot consider it defective for that reason. *Rule 4, respecting Appeals,* in 29 *Md.,* 2. Having thus disposed of all the questions presented by the record, and finding no ground of reversal, it follows the judgment must be affirmed.

*Judgment affirmed.*

(Decided 9th December, 1880.)